506 P.2d 1092

Morton FREEDMAN, Arizona Properties of Illinois, Inc., an Illinois corporation, and Bell Brand Land and Development Company, an Arizona corporation, Appellants,

v.

Clifford L. WOLFSWINKEL, Arizona Properties, Inc., an Arizona corporation, and George Miller, Appellees.

Morton FREEDMAN, Arizona Properties of Illinois, Inc., an Illinois corporation, Bell Brand Land and Development Company, an Arizona corporation, Clifford L. Wolfswinkel, Arizona Properties, Inc., an Arizona corporation, and George Miller, Appellants,

v.

William SUDBRACK, Executor of the Estate of Marzella Ann Roer, Deceased, Appellee.

No. 1 CA–CIV 1593.

Court of Appeals of Arizona, Division 1, Department A.

March 6, 1973.

Rehearing Denied April 17, 1973.

Review Denied May 22, 1973.

Shimmel, Hill & Bishop, P. C., by Merton E. Marks and Richard B. Johnson, Phoenix, and Lissner, Rothenberg, Reif & Barth, by Henry B. Rothenberg, Chicago, Ill., for Morton Freedman, Bell Brand Land And Development Co., an Arizona Corporation, and Arizona Properties of Illinois, Inc., an Illinois Corporation.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by John H. Killingsworth and Richard J. Woods, Phoenix, for Clifford L. Wolfswinkel, Arizona Properties, Inc., an Arizona Corporation, and George Miller.

Minne & Sorenson and Cavness, DeRose, Senner & Rood, by John W. Rood, Phoenix, for William Sudbrack, Executor of Estate of Marzella Ann Roer, Deceased.

STEVENS, Judge.

Marzella Ann Roer (Mrs. Roer) met her death by an accident which occurred on Saturday, 22 June 1968. At the time she was an unmarried woman, 36 years of age and the mother of sons aged 10 and 12. An action for damages was filed resulting in a judgment in favor of her estate against all of the defendants in the sum of $80,000. All of the parties to the Superior Court action are before this Court in connection with this appeal. In addition to the common defenses offered by all defendants there were issues raised as to whether personal jurisdiction had been acquired as to some of the defendants and as to whether there was a right of indemnity in favor of certain of the defendants.

The parties-defendant can be segregated into two groups, the Freedman group and the Wolfswinkel group. Morton Freedman (Freedman) is a resident of Chicago and a licensed real estate broker in the State of Illinois. Arizona Properties of Illinois, Inc., an Illinois corporation, (Arizona Properties-Illinois) is also a licensed real estate broker in the State of Illinois. Freedman owned 90% of the corporate stock of Arizona Properties-Illinois. The Bell Brand Land and Development Company, an Arizona corporation, (Bell Brand) is the owner of real property in Arizona, the property being known as the Bell Brand Ranch. Freedman owned 40% of the capital stock of Bell Brand and was its president. Charles Goldberg (Goldberg) who is not a party to this action also owned 40% of the capital stock. Collectively, the defendants Freedman, Arizona

Properties-Illinois and Bell Brand will be referred to as the Freedman group.

Clifford L. Wolfswinkel (Wolfswinkel) is an Arizona resident. He is an officer of and the owner of 50% of the capital stock of Arizona Properties, Inc., an Arizona corporation (Arizona Properties-Arizona). George Miller (Miller) at all times material to this litigation was an Arizona resident and an employee of Wolfswinkel and of Arizona Properties-Arizona. Collectively, the defendants Wolfswinkel, Arizona Properties-Arizona and Miller will be referred to as the Wolfswinkel group.

There were changes in the corporate ownership and corporate names before and after 22 June 1968. In the interest of simplicity we disregard these changes and refer to the corporate status as of 22 June 1968 as though there were no changes before that date or after that date up to the date of trial in July 1970.

In mid-1967 Wolfswinkel and his wife, as individuals, owned 5,000 acres of land near Sanders, Arizona, a property known as the Bell Brand Ranch. Freedman became interested in purchasing the property and in developing it for sale in acre and larger tracts. In the fall of 1967 a trust was created wherein Bell Brand became the buyer with specified release provisions as the various parcels of land were sold. In order to secure funds for the purpose of surveying the land, to lay out and grade the streets, to erect street signs and to delineate the various parcels to be sold, Bell Brand borrowed money from Arizona Properties-Arizona. Freedman and Goldberg gave their personal guarantees in connection with these transactions. The trust paid portions of the monies received from the sale of the various parcels of land to Wolfswinkel individually as the former owner, to Arizona Properties-Arizona in repayment of the development loan and to the various Freedman interests.

Freedman and Arizona Properties-Illinois were engaged in the sale of the Bell Brand Ranch land only in the Chicago area. While both Freedman and Arizona Properties-Illinois were licensed real estate brokers in Illinois neither was licensed in Arizona. All efforts toward sales were made in the State of Illinois and no efforts to effect sales were made in Arizona, no sales were made in Arizona and no Arizona residents were buyers. By 22 June 1968 the sales were going well and no one was uneasy about the ultimate financial success of the venture.

In late 1967 Wolfswinkel proposed to Freedman that there be a western outing on the property. Plans began to take shape. Freedman contacted the buyers of the Bell Brand Ranch property. An all expense tour was offered to the buyers by the Freedman group, the price being $195 for one person and $375 for a couple. Approximately 70 persons accepted the offer. Freedman came with the group as did 7 of Arizona Properties-Illinois salesmen whose expenses were paid under some arrangement but not borne by Arizona Properties-Illinois. There was an overall deficit resulting from the tour which was paid by Arizona Properties-Illinois.

On the day in question the party left Chicago at approximately ten in the morning flying to Albuquerque, New Mexico. The party traveled from Albuquerque by chartered buses to Gallup, New Mexico, for lunch and from Gallup in the same buses to two motels in the vicinity of the Bell Brand Ranch. After a rest at the motels, the party boarded the buses to go to the scene of the planned festivities.

In the course of the planning for the event there were many conferences between Freedman and Wolfswinkel. Freedman was concerned not only with the expense but also with a close timetable of events. While it is not clear from the record of the trial what the plans were for Sunday the 23rd and just when the people were to return to Chicago, the entertainer testified that he had a two-evening engagement, playing the first evening on Saturday the 22nd, and the man who cooked the outdoor meals had two evening meals to prepare, the first also being on Saturday

the 22nd. So, it appears that there were Sunday events planned.

Wolfswinkel proposed that the Chicago people be permitted to ride horseback but Freedman was fearful of injury without adequate supervision and that proposal was vetoed by Freedman. Wolfswinkel proposed a scenic tour and one of his employees took the tour to explore the possibilities thereof. The tour was ruled out by Freedman due to the time element. There were many items which were suggested. Freedman approved some and did not approve others. Those expressly discussed and which Freedman disapproved were not held. The general overall plan was approved by Freedman and many of the details were arranged by Wolfswinkel without the necessity of securing prior specific Freedman approval as to those details.

There was a roundup and a branding of cattle on the evening of the 22nd, these events taking place immediately upon the arrival of the buses at the Bell Brand Ranch. Wolfswinkel cattle were used at no expense to Freedman. Wolfswinkel secured and paid for the necessary help. The details were fully under Wolfswinkel's control.

There was no suitable building on the Bell Brand Ranch to use as a headquarters and Arizona Properties-Arizona purchased an adjoining property on which there was a two-bedroom house. The Freedman group paid to have some redecorating done. No rent as such was paid for the use of the house or the surrounding land. Prior to the event Wolfswinkel and Freedman had talked to some extent of the possibility of a resale of this later acquired property by Arizona Properties-Arizona to Freedman and this prospective sale was one of the reasons that Wolfswinkel's Arizona Properties-Arizona purchased the property. Freedman testified that the trip was not primarily a sales promotion venture, and that only persons who had already purchased land were invited by him. Freedman admitted that there could be financial rewards to his interests in the completion of the sales and in new prospects, as well as a reduction of the overall balance covered by his personal guarantee. Wolfswinkel testified that there were definite financial benefits which he could have derived from a successful weekend. While most of the expense was borne by the Freedman group, there was some expense borne by the Wolfswinkel group.

The estimates as to the total number of people at the festivities on the evening of 22 June varied. In addition to personnel who were assisting Wolfswinkel in his portion of the entertainment and their families there were some other Wolfswinkel guests. We believe it is safe to say that in the neighborhood of 100 or more people were there at the time in question.

Mrs. Roer and Wolfswinkel had been friends for some years. Both lived in the Phoenix area, some distance from the Bell Brand Ranch. Arizona Properties-Arizona owned a subdivision known as the Timberlake Pines near Heber, Arizona, a property suitable for summer residences and Wolfswinkel encouraged Mrs. Roer to seek a license to sell real estate believing that she would be a successful sales person in connection with the Arizona Properties-Arizona property. Mrs. Roer had taken and had passed the salesman's license examination but had not been issued her license before the day in question. At Wolfswinkel's invitation, and at the expense of the Wolfswinkel group, Mrs. Roer came to the Bell Brand Ranch the afternoon of 22 June and thereafter went to one of the two motels at which the Chicago people were to stay to act as a hostess for the arriving guests. She received no monetary compensation. She benefited only by the payment of her expenses and perhaps some experience which might be of value to her should she thereafter attempt to sell real estate.

The headquarters was on a slight rise. In front of the building was a slightly curving driveway which was possibly 25 to 30 or 35 feet wide. The chuck wagon which was used for the preparation of the evening meal was in a grassy area across

the driveway in front of the headquarters. The branding area was in a nearby corral.

Liquid refreshments, both alcoholic and non-alcoholic, as well as snacks, were available for the guests. The alcoholic consumption of the guests was moderate.

There was a disparity as to the exact time that the various happenings occurred and as to the exact status of daylight, dusk and darkness. In close time proximity the branding ended, the entertainer set up his equipment and the steaks were put on the fire. Wolfswinkel believed that there was an extra 15 minutes available and he and Miller agreed to a horse race for the entertainment of the guests. Freedman was not consulted with reference to this event. Wolfswinkel felt that he had some say and some responsibility in connection with the overall entertainment. Two horse races were run. The first was run without incident. The tragedy occurred in connection with the second race. Freedman stated that he had no knowledge of the intended first race or of the race itself. The first race was announced by the use of a bull horn. After the race was completed Wolfswinkel and Miller agreed to race again, this time starting from a point out of sight of the front of the headquarters, rounding the curve and ending in front of the headquarters on the driveway.

The second race was announced in a loud voice and without question a number of people who were in attendance were aware that a race was to be run. Mrs. Roer knew of the plans for the second race. After Wolfswinkel and Miller left the front of the headquarters to go to the area where the race was to start, Mrs. Roer and Mr. Martis as well as Wolfswinkel's brother and Wolfswinkel's secretary started to dance in the driveway. There is a conflict as to how many more couples were dancing. There is a conflict as to the number of people who were actually in the driveway. As the horses were racing toward the front of the headquarters building Mr. Martis was struck and injured and

Mrs. Roer was struck, the injuries which she sustained proving to be fatal.

Freedman professed a complete lack of knowledge of either race until the moment of impact sustained by Mrs. Roer. There was conflicting testimony as to Freedman's physical location at the time the second race was announced and at the time Wolfswinkel and Miller left for the second race.

There was evidence that Miller had consumed several beers and that his conduct was not that of the experienced cowboy that he was. There was evidence of at least one beer consumed by Wolfswinkel and as to his inability to mount his horse without help. There was evidence that neither Wolfswinkel nor Miller was under the influence of alcohol at the time of the second race. All defendants complained of the instruction which the court gave on the subject of voluntary intoxication.

As between the Freedman group and the Wolfswinkel group the case was submitted to the jury on two theories. One theory was that Wolfswinkel was the agent of Freedman and the other that the whole affair was a joint venture. By the instructions the jury was advised that if Wolfswinkel was the agent of the Freedman group, that then and in that event, the Freedman group could recover over indemnity for the Freedman group's *vicarious* liability against the Wolfswinkel group. The instructions and form of verdict which authorized a joint recovery against both the Freedman group and the Wolfswinkel group based upon the joint venture theory did not permit a Freedman group recovery over as indemnity. By the verdicts which it returned the jury found the affair to be a joint venture.

## LONG ARM SERVICE

 Rule 4(e)(2), Rules of Civil Procedure, 16 A.R.S., provides in part that when a person or a corporation "has caused an event to occur in this state out of which the claim which is the subject of the complaint arose" such party can be served by constructive service. Freedman

and Arizona Properties-Illinois were both so served in the State of Illinois. Each separately and both jointly strenuously urged and now urge the absence of personal jurisdiction in the Arizona court. Freedman also urged that he could not be personally liable as he acted only as a corporate officer. These defendants also urge that the horse race was not previously discussed with or authorized by the Freedman group and that under those circumstances it cannot be said that the Freedman group "caused an event to occur."

We hold that such a position is too restricted. The jury found a joint venture. The horse race was part and parcel of the joint venture and while the horse race was not expressly approved by Freedman, it was part of the overall weekend of festivities which entertainment was an event which the Freedman group "caused to occur". This activity comes well within Rule 4(e)(2) and in our opinion is even a clearer situation for its use and application than either Phillips v. Anchor Hocking Glass Corporation, 100 Ariz. 251, 413 P.2d 732 (1966), or Pegler v. Sullivan, 6 Ariz.App. 338, 432 P.2d 593 (1967). Freedman's active personal participation in connection with his personal financial interests subjected him to personal liability even though he was also a corporate officer of two of the corporate defendants in the Freedman group.

## STATUS OF MRS. ROER

■ The Wolfswinkel group urged in the trial court and urges here that Mrs. Roer was at all times on the fatal day an employee of Wolfswinkel and of Arizona Properties-Arizona and that as such employee her estate was limited in its remedies to the Workmen's Compensation Act. See A.R.S. §§ 23–901, subsec. 4, par. b and 23–1022 prior to the amendments effective 1 January 1969. The Freedman group urged that if there be a joint venture then Mrs. Roer was also the employee of the Freedman group and on that basis joined in the contentions urged by the Wolfswin-

kel group. Prior to the jury trial, the trial court tried this issue without a jury pursuant to Morgan v. Hays, 102 Ariz. 150, 426 P.2d 647 (1967), and determined that Mrs. Roer was not an employee. Based on the evidence presented to the jury as well as the evidence presented to the court in the absence of the jury, all of the defendants again urged without success that the trial court declare Mrs. Roer to have been an employee. The same questions are presented on appeal. Based upon the evidence, the finding of the trial court was clearly correct.

## VOLUNTARY INTOXICATION

■ At the plaintiffs' request, the trial court gave an instruction on the effect of voluntary intoxication. There was no objection to the substance of the instruction, however, an objection made by the Wolfswinkel group and joined by the Freedman group was made as follows:

"that there is no significant credible evidence to support the giving of such an instruction, the jury by being so instructed is allowed to find that one was intoxicated or under the influence of liquor when the overwhelming weight of the evidence would not permit such a finding."

We concur with the trial court and with plaintiffs' counsel that there was sufficient evidence in the record to support the giving of the instruction.

The two grounds which the Wolfswinkel group urge as a basis of reversal, namely, Mrs. Roer's status as an employee and the giving of the voluntary intoxication instruction, have now been ruled upon by this Court in this opinion. All other issues before this Court are issues which were raised by the Freedman group.

## RIGHT OF INDEMNITY

The Freedman group urges that the trial court committed reversible error in not instructing the jury as to the Freedman group's right of indemnity on its cross-claim against the Wolfswinkel group.

The Freedman group attempted to base its claim for indemnity upon the jury finding either that an agency or joint venture relationship existed. The Freedman group offered its Instruction No. 13 which we quote, the italicized portion being the portion which was stricken by the trial court before the instruction was given.

"If you should find from a preponderance of the evidence that at the time of the accident in question WOLFSWINKEL, MILLER, or ARIZONA PROPERTIES, INC. *either* were the agents of BELL BRAND LAND AND DEVELOPMENT COMPANY, ARIZONA PROPERTIES OF ILLINOIS or FREEDMAN, and that they were acting within the scope of their agency, *and in the manner directed or authorized by their principals or that a joint venture existed between WOLFSWINKEL, MILLER or ARIZONA PROPERTIES, INC., on the one hand, and BELL BRAND LAND AND DEVELOPMENT COMPANY, ARIZONA PROPERTIES OF ILLINOIS or FREEDMAN, on the other and that WOLFSWINKEL, MILLER, or ARIZONA PROPERTIES, INC. were acting within the scope of such joint venture,* in such case BELL BRAND LAND AND DEVELOPMENT COMPANY, ARIZONA PROPERTIES OF ILLINOIS and FREEDMAN would be entitled to recover on their crossclaim against WOLFSWINKEL, MILLER and ARIZONA PROPERTIES, INC. the full amount of any judgment rendered in favor of the plaintiff and against BELL BRAND LAND AND DEVELOPMENT COMPANY, ARIZONA PROPERTIES OF ILLINOIS or FREEDMAN."

The Freedman group entered strenuous objections to the Wolfswinkel requested Instruction No. 6 which the court gave as follows:

"If you find that any of the defendants are liable jointly to the plaintiff as joint venturers, then in such case there exists no right of contribution or indemnity among such persons jointly liable."

The Freedman group record on the settlement of instructions is adequate in relation to the interrelationship between the Wolfswinkel Instruction No. 6 and the Freedman Instruction No. 13. Had the trial court given the Freedman group requested Instruction No. 13 without modification, the trial court would have thereby instructed that if the jury found a joint venture then as a matter of law the Freedman group would be entitled to indemnification against the Wolfswinkel group.

The Freedman group, while recognizing that there is no Arizona case law expressly in point on the joint venture situation, strongly urges the rationale of Busy Bee Buffet v. Ferrell, 82 Ariz. 192, 310 P.2d 817 (1957), and Arizona cases following the Busy Bee reasoning. In their reply brief the Freedman group again summarized that position as follows:

"the Appellants have argued that the right of indemnity between joint tort feasors arises only when the indemnitee has an imputed or vicarious liability for damage caused by the indemnitor and the liability of the indemnitor is based upon his active negligence, as opposed to the passive negligence, if any, of the indemnitee.

"Before the right of indemnity becomes operative, there must be a finding of active negligence on the part of the indemnitor and a concurrent finding of passive negligence, if any, on the part of the indemnitee."

A review of the Freedman group's requested instructions discloses that the requested instructions are not adequate in scope to instruct a jury on the rationale of Busy Bee Buffet v. Ferrell. We do not find in the instructions tendered by the Freedman group an outline of legal principles similar to those quoted from their reply brief which would have given the jury

**314**

the option to return an indemnity verdict if it made findings of fact establishing a basis therefor.

We are exceedingly reluctant to avoid a decision relating to the right of indemnity between joint venturers issue on grounds not expressly raised by the able counsel on this appeal. On the other hand, we find that the record is not adequate to permit us to rule otherwise in this case.

It is not our purpose or intent to set forth a rule of law on the subject of indemnity between joint venturers. We only hold that if the theory set forth in the above-quoted portion of the brief is sound, that theory was not presented under a proper set of requested instructions. We find an absence of error in the overruling of the Freedman group objections to the Wolfswinkel group requested Instruction No. 6 and Freedman group requested Instruction No. 13.

█ The Freedman group raises two more issues. The trial court gave a contributory negligence instruction and refused to give the requested assumption of risk instruction in relation to Mrs. Roer's personal conduct. In Bryant v. Thunderbird Academy, 103 Ariz. 247, 439 P.2d 818 (1968), our Supreme Court discussed the matter of assumption of risk and stated:

"To invoke the doctrine of assumed or incurred risk, it is essential that the risk or danger shall have been known to and appreciated by plaintiff or that it shall have been so obvious that it must be taken to have been known or comprehended." 103 Ariz. at 249, 439 P.2d at 820.

We find no error in failing to give the assumption of risk instruction.

█ The Freedman group urge that there should have been an instruction which would permit the jury to find that the Wolfswinkel group were independent contractors. We find no error in that regard.

This case was exceptionally well tried in the trial court by counsel and by the trial court. We find no reversible error.

Affirmed.

DONOFRIO, P. J., Department A, and EUBANK, J., concur.